Filed 5/12/21  P. v. Gonzalez CA3
Received for posting on Saturday, 5/15/21

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Glenn)

----

|  |  |
|---|---|
| THE PEOPLE, | C089973 |
| Plaintiff and Respondent, | (Super. Ct. No. 17NCR12408) |
| v. | |
| SANTIAGO GONZALEZ, JR., | |
| Defendant and Appellant. | |

Defendant Santiago Gonzalez, Jr., threw a Molotov cocktail at an occupied apartment building, setting the building on fire.  One of the building's occupants was able to douse the fire.

A jury found defendant guilty of three counts of attempted murder as to three of the building's occupants, three counts of igniting or exploding a destructive device with intent to murder those same residents, arson of property, and possessing, igniting, or exploding a destructive device with intent to injure or destroy property.

1

On appeal, defendant contends the trial court prejudicially erred by incorrectly instructing the jury on the kill zone theory of attempted murder, the scope of which our Supreme Court clarified in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) after trial concluded.  The Attorney General agrees the trial court's kill zone instruction was erroneous, but argues the error was harmless.

We agree with defendant that the use of the erroneous kill zone instruction here was prejudicial error.  Accordingly, we reverse the judgment as to the attempted murders and because the error spilled over to the intent to murder requirement contained in the three counts of exploding a destructive device, we reverse those convictions as well.  We explain that because the evidence is insufficient to support a conviction of attempted murder or exploding a destructive device as to two of the three victims, retrial is precluded as to those four counts.

Defendant raises multiple other claims.  We conclude he has failed to demonstrate that the prosecutor's misconduct while cross-examining a defense alibi witness was prejudicial, and we disagree defendant's trial counsel was constitutionally deficient for failing to subpoena a potential alibi witness.  Because we reverse the judgment as to the attempted murder and exploding a destructive device counts, we need not and do not address defendant's sentencing claims.

**FACTS AND PROCEEDINGS**

*Factual Background*

Jessica Mendiola and her sister Yvette Mendiola lived in an apartment on the second floor of an apartment building within a larger apartment building complex in Willows.[1]  The building consisted of eight apartments, with four units facing one direction and four units facing the opposite direction.  Each side of the building included

---

[1] Due to their shared surname, we refer to individual members of this family by their first names.

two apartments on the second floor and two apartments on the first floor. The front wall of Jessica and Yvette's apartment had a sliding glass door that went outside to a patio, and a door used to enter and exit the apartment.

Defendant's girlfriend, Ericka Beck Morias, lived in an apartment in a building within the same complex, and defendant occasionally stayed at Morias's apartment.[2] Jessica grew up with Morias and knew defendant through her. Defendant had been in Jessica's apartment with Morias on prior occasions.

At trial Yvette testified that on September 27, 2017, Jessica, Morias, and defendant had been in an argument, and that the argument was "pretty heated." Yvette agreed defendant "stepped in and went after" Jessica. Yvette was not present when the argument took place.

*The Fire*

At approximately midnight on September 27, Jessica and Yvette were lying on the couch in their apartment when they heard a loud "boom" that sounded "like a bomb." Jessica ran to the sliding door because she saw a light that "looked like fire light" outside the apartment. Jessica told Yvette to call 911. Jessica was "hundred percent" sure she saw defendant standing by a rock approximately 10 to 15 feet from her apartment. Defendant wore gray or brown shorts, a hat, and a bandana over his mouth. Jessica yelled defendant's name, and defendant ran. Jessica subsequently told the 911 operator defendant was "throwing fire bombs at [her] apartment." In a statement to a sheriff's deputy the night of the fire, Jessica said she believed defendant was aiming for her apartment because Morias had stolen from her.

---

[2] Neither the parties nor the record is consistent as to the spelling of Morias's name. We spell her name as Ericka Beck Morias, as preferred by defendant, for consistency.

3

Jeffrey Bigelow (Bigelow) lived in the apartment below and to the side of Jessica and Yvette's. The apartment directly under Jessica and Yvette's apartment was unoccupied. Bigelow heard loud sounds coming from above his apartment and went outside. He smelled gasoline and saw "billowing black smoke coming out of [his] neighbor's balcony." He saw the ground of the apartment building was on fire, and flames were crawling up the wall. Bigelow put the fire out by throwing multiple small buckets of water on it.

*Investigation and Trial Testimony*

Upon arriving at the apartment building at approximately 1:00 a.m., Detective Kelly Knight smelled "ignitable liquid" around the porch area of the apartment directly below Jessica and Yvette's. Knight collected remnants of what he believed to be a Molotov cocktail, which is a destructive incendiary device. Knight testified: "A [M]olotov cocktail would be a flammable or ignitable liquid placed typically in a glass container. Since they're typically breakable where you light the wick of some sort of fabric, throw it so the bottle would break, spilling and spattering the ignitable liquid every where [*sic*] and anywhere so it would start a fire." Knight retrieved additional cloth consistent with the cloth found in the Molotov cocktail near the location of the fire and in the apartment where defendant had been staying, and a plastic disposable lighter from the area near the rock where Jessica saw defendant standing. Knight opined the fire had been intentionally set using a Molotov cocktail.

Chief Wayne Peabody of the Willows Fire Department testified the fire was caused by a Molotov cocktail, and it could potentially have grown to block both the sliding door and front door of all four residences and burned the building down--or at least the side of the building where the fire started--had it been given the opportunity to burn. Peabody concluded that no exit path from any occupied apartment was actually obstructed.

4

*Verdict and Sentence*

Before trial, defendant admitted allegations that he had served nine prior prison terms and that he was on bail at the time of the incident. (Pen. Code, §§ 667.5, subd. (b), 12022.1.)[3] The jury found him guilty of attempted murder of Bigelow, Jessica, and Yvette, respectively. (§§ 664, 189; counts I-III.) The prosecution had further alleged as to each of those counts that defendant personally used a deadly and dangerous weapon, to wit, a Molotov cocktail (§ 12022, subd. (b)(1)), but these deadly weapon allegations were neither admitted by defendant nor presented to the jury for decision.

The jury further found defendant guilty of unlawfully exploding or attempting to explode a destructive device or an explosive, with the intent to murder Bigelow, Jessica, and Yvette, respectively (§ 18745; counts IV-VI); arson of four apartments in an inhabited structure (§ 451, subd. (b); count VII); and unlawful possession and explosion of a destructive device or explosive with intent to injure or destroy property (§ 18740; count VIII).

The trial court denied two motions for new trial filed by defendant, and it sentenced him to an aggregate prison term of 26 years to life as follows: three consecutive life sentences for the attempted murder counts (§§ 664, 189); three consecutive one-year sentence enhancements for the weapons allegations as to those counts (§ 12022, subd. (b)(1))[4]; three concurrent life sentences for the exploding a destructive device counts (§ 18745); two years consecutive for the on-bail enhancement (§ 12022.1); and concurrent terms of five years for each of the arson of an inhabited

---

[3] Further undesignated statutory references are to the Penal Code.

[4] As we briefly discuss *post*, the life sentences were not appropriate given the jury's failure to find premeditation and deliberation. Further, defendant challenges the imposition of the sentence as to the weapons allegations on the basis the allegations were neither found true by the jury nor admitted by defendant. Because we reverse the underlying counts of conviction, we do not address this claim of error.

structure and possession of an explosive or destructive device counts (§§ 451, subd. (b), 18740).  The court struck defendant's prior prison term enhancements in the interest of justice.  (§ 667.5, subd. (b).)

Defendant filed a timely notice of appeal.  He subsequently filed a second notice of appeal in pro per.

## DISCUSSION

### I

### *Attempted Murder and the Kill Zone Jury Instruction*

Defendant contends the trial court prejudicially erred by instructing the jury on a kill zone theory of attempted murder because the instruction failed to identify a primary target, and the facts do not satisfy the standard required to instruct the jury on the theory as clarified after trial in *Canizales*, *supra*, 7 Cal.5th 591.  He asserts the court's error requires reversal not only of his convictions for attempted murder as to Bigelow, Jessica, and Yvette (counts I-III), but also of the three counts of unlawfully exploding a destructive device with intent to murder those same individuals (counts IV-VI) because the jury could have applied the erroneous kill zone instruction to find he intended to murder Bigelow, Jessica, and Yvette as required by those counts.

The Attorney General agrees with defendant that the instruction failed to identify a primary target, but he contends in conclusory fashion that "it is logical" the kill zone theory would still apply to the facts here even after *Canizales*.  Although he recognizes the kill zone instruction was erroneous, the Attorney General contends the error was "clearly harmless" because the jury necessarily found defendant intended to kill Jessica, Yvette, and Bigelow by finding him guilty of the exploding an explosive device counts. We agree with defendant that all six counts must be reversed.

A. *Attempted Murder Charges, Verdicts, and Instructions*

We begin by noting that defendant was charged with committing willful, deliberate, and premeditated attempted murder, and the jury was instructed that, if it

6

found defendant guilty of attempted murder as to Bigelow, Jessica, and Yvette, "you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation." (See § 664, subd. (a) [fact that attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact].)

However, the verdict forms signed by the jury foreperson for counts I through III only reflected that the jury found defendant guilty of "attempted murder . . . in violation of Section 664/189 of the Penal Code." (Capitalization omitted.) The verdict forms did not mention the additional allegation that the attempted murder was willful, deliberate, and premeditated. The verdict form's reference to "Section 189" does not establish the attempted murder was willful, deliberate, and premeditated, as section 189 merely sets forth the degrees of murder, including first degree murder that is willful, deliberate, and premeditated (§ 189, subd. (a)), and second degree murder defined as murder other than first degree murder (§ 189, subd. (b)). Moreover, the verdict forms, while titled to reflect the count at issue in the verdict form, do not specify the jury is finding defendant guilty "as charged in the information" or with any similar verbiage. (See *People v. Bratis* (1977) 73 Cal.App.3d 751, 764 [jury clearly expresses its intent to convict the defendant of the charged crime when the jury's guilty verdict refers to a specific count in the information].) Thus, we are unable to say that the verdict forms " 'clearly indicate[d] the intention of the jury to find the defendant guilty of the offense with which he is charged.' " (*Ibid.*) Accordingly, the jury did not find defendant committed attempted murder willfully, deliberately, and premeditatedly. Without a "willful, deliberate, and premeditated" finding by the jury, the court only had discretion to sentence defendant to a determinate term of five, seven, or nine years. (*People v. Seel* (2004) 34 Cal.4th 535, 541; § 664, subd. (a).) As we next explain, we must reverse these counts of conviction due to the error in instruction; accordingly, we take no action regarding the error in sentencing.

7

The trial court instructed the jury on the crime of attempted murder (§§ 664, 189; counts I-III) with a modified version of CALCRIM No. 600, which instructed the jury in pertinent part:  "The defendant is charged . . . with attempted murder.  To prove that the defendant is guilty of attempted murder the People must prove number one, that the defendant took at least one direct but ineffective step toward killing another person.  And number two, the defendant intended to kill that person.  [¶]  . . . [¶]  A person may intend to kill a specific victim or victims and at the same time intend to kill everyone *within a particular zone of harm or 'a kill zone.'*  In order to convict the defendant of the attempted murder of [Jessica], [Yvette] and [Bigelow] on a concurrent intent theory, the People must prove that the defendant not only intended to kill but also either intended to kill [Jessica], [Yvette] or[5] [Bigelow] or intended to kill everyone within the kill zone.  [¶]  If you have a reasonable doubt whether the defendant intended to kill [Jessica], [Yvette] and [Bigelow] on a concurrent intent theory by killing everyone within in [*sic*] the kill zone then you must find the defendant not guilty . . . ."  (Italics added.)  The instruction did not define "kill zone" beyond the quoted instruction, and the instructions did not provide any other definition for "intent to kill."

B.  *Legal Background*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citation.]  When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be

---

**5**  The written instruction uses the word "and" here.  "To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.  [Citations.]"  (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)  The discrepancy does not affect our analysis.

8

'transferred' from one attempted murder victim to another under the transferred intent doctrine. [Citation.] [¶] Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime. [Citations.]" (*Canizales*, *supra*, 7 Cal.5th at p. 602.)

The kill zone theory of attempted murder was first adopted in California in *People v. Bland* (2002) 28 Cal.4th 313. The theory "address[es] the situation in which a killer intends to kill one person, as well as all the people in the intended victim's immediate vicinity, to ensure the death of the intended victim. In such a case—and only in such a case—the kill zone instruction may be used, and the defendant may be found guilty of attempted murder of anyone in the kill zone." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 391.) After trial concluded in this case, our Supreme Court reexamined the kill zone theory with the goal of "more clearly defining" it. (*Canizales, supra*, 7 Cal.5th at p. 606.)[6] *Canizales* held the kill zone theory may be applied *only* when a jury concludes: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id.* at p. 607.)

---

[6] While *Canizales* was decided after trial, its holding applies retroactively to all cases not yet final on appeal. (*In re Rayford* (2020) 50 Cal.App.5th 754, 776-778.)

Conversely, "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Canizales*, *supra*, 7 Cal.5th at p. 607, quoting *People v. Medina* (2019) 33 Cal.App.5th 146, 156, review granted June 19, 2019, S255373.) "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Ibid.*)

The *Canizales* court emphasized that courts must exercise caution when determining whether to permit the jury to rely on the kill zone theory. (*Canizales*, *supra*, 7 Cal.5th at p. 608.) The instruction is only appropriate "where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Ibid.*)

Finally, the *Canizales* court recognized, "[w]hen the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, . . . evidence of a primary target is required." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) " '[W]ithout a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.' " (*Ibid.*)

C. *Analysis*

"An appellate court reviews the trial court's decision to give a particular instruction de novo." (*People v. Stinson* (2019) 31 Cal.App.5th 464, 476.) In doing so, the court must determine whether there was sufficient evidence to support the challenged instruction and whether the instructions delivered a correct and complete statement of the law. (*Ibid*.)

The parties agree, as do we, that the kill zone instruction did not allege a primary target as required to create a kill zone. (See *People v. Medina*, *supra*, 33 Cal.App.5th at p. 156; *In re Rayford*, *supra*, 50 Cal.App.5th at p. 782, fn. 19 [instruction failed to require shooter to have a primary target for kill zone theory to apply].) As explained in *Medina*: "The kill zone theory is one of concurrent intent—the defendant has the intent to kill a particular target, and the jury can infer from the method employed to attempt killing the primary target a concurrent intent to kill those around the primary target to ensure the primary target's death. [Citation.] Without a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent." (*Medina*, at pp. 154-155; see also *People v. Cerda* (2020) 45 Cal.App.5th 1, 18 ["Intent to kill the others could not be concurrent to an intent to kill a primary target if there was no primary target"].)

Here, there is substantial evidence that Jessica was the primary target of defendant's attack. Jessica testified as to her belief defendant was seeking revenge against her, and Yvette testified Jessica had been in an argument with defendant and Morias earlier on the day of the fire. But the instruction expressly informed the jury there *need not be* a primary target. The jury was instructed that it could find defendant guilty of attempted murder of Jessica, Yvette, and Bigelow provided the People prove "that the defendant not only intended to kill but also *either* intended to kill [Jessica], [Yvette] or [Bigelow] *or* intended to kill everyone within the kill zone." (Italics added.) This erroneous instruction was reinforced by the prosecutor's closing argument: "Now a

11

person doesn't even need to have a specific target. It is just putting into motion circumstances where the likelihood that people in this zone of harm would die." The instruction failed to correctly inform the jury about the kill zone theory of attempted murder.

The Attorney General asserts: "Given . . . the use of an explosive device and the way in which the fire was set to trap all of the occupants . . . it is logical that even following *Canizales*, the kill zone theory would still be applicable . . . ." But there is not sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstance of the offense is that defendant intended to kill everyone in the zone of fatal harm, to the extent such a zone even existed. (*Canizales*, *supra*, 7 Cal.5th at p. 608.) Even if the jury could have reasonably inferred that defendant intended to kill each of the residents of the apartment building by throwing a Molotov cocktail onto the patio of a vacant apartment, a reasonable jury would most likely also recognize the reasonable inference that defendant intended to frighten, injure, or punish, or even kill Jessica, and only recklessly disregarded the safety of anyone else living in the apartment complex. (See *ibid.* ["The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction"]; *In re Rayford*, *supra*, 50 Cal.App.5th at p. 780 [evidence was equivocal whether victim was hit by bullet within zone of fatal harm or was hit by bullet fired with conscious disregard of the risk of seriously injuring building occupants]; *People v. Perez* (2010) 50 Cal.4th 222, 232 [kill zone instruction was error because shooting not the equivalent of an explosive device with intent to kill everyone in the area of a blast or spraying a crowd with automatic gunfire].) Chief Peabody testified that the fire, if left unchecked, could have *eventually* and *potentially* blocked the exits of the apartments, but defendant did not barricade the doors of everyone living inside the apartment building. Bigelow put the fire out with a few small buckets of water. At no point were the victims trapped by the fire. The facts here are readily distinguishable from a gunman creating a kill zone by spraying bullets

12

into a group incapable of dispersing, or a person detonating a bomb on an airplane in flight--the example used by the prosecutor in closing.

Because there is not sufficient evidence to support a jury finding that the only reasonable inference was that defendant intended to create a zone of fatal harm, the kill zone instruction--even if it properly identified a primary target, which this instruction did not--was not appropriate in this case.

D. *Prejudicial Error*

We next consider whether the error in instructing the jury was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18. (*People v. Aledamat* (2019) 8 Cal.5th 1, 13-15.) "The *Chapman* standard of review requires 'the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Garcia* (2020) 46 Cal.App.5th 123, 201.)

The Attorney General contends the instructional error was "clearly harmless" because the jury also found defendant guilty of exploding a destructive device with intent to murder Bigelow, Jessica, and Yvette as charged in counts IV through VI. The trial court instructed the jury as to those counts with CALCRIM No. 2576, which instructed in relevant part: "[T]he defendant is charged in counts four, five and six with exploding an explosive with intent to commit murder, in violation of [§ 18745]. To prove that the defendant is guilty of this crime, the People have to prove, number one the defendant exploded an explosive and number two, when the defendant did so he acted with the intent to murder someone." The instruction did not define "murder" or "intent to murder someone."

According to the Attorney General, the kill zone theory only applied to the attempted murder counts, and the jury's guilty verdicts regarding the exploding a destructive device counts demonstrate the jury found that defendant intended to murder

13

each of Jessica, Yvette, and Bigelow without application of the erroneous kill zone instruction.

We are not persuaded. The trial court gave CALCRIM No. 251, which instructed the jury that the specific intent required *for both attempted murder and exploding a destructive device* is "intent to kill." In turn, CALCRIM No. 600 informed the jury that "[a] person may intend to kill a specific victim or victims and at the same time intend to kill everyone within a particular zone of harm or 'a kill zone.' " That instruction was not expressly limited to the attempted murder counts; the jury could easily and reasonably interpret that instruction as applying to defendant's "intent to murder someone," as instructed in CALCRIM No. 2576. Accordingly, the jury reasonably could apply CALCRIM No. 600 and CALCRIM No. 2576 to find: (1) defendant established a kill zone, and therefore he intended to kill each of the victims charged in the attempted murder counts, and (2) because defendant intended to kill the individuals within the kill zone, defendant intended to murder those same individuals as required to find defendant guilty of the exploding a destructive device counts.

Because we cannot conclude beyond a reasonable doubt that the erroneous kill zone instruction did not contribute to the verdicts as to counts I through III as well as counts IV through VI, the judgment as to counts I through VI is reversed.[7]

II

*Sufficient Evidence of Intent to Kill*

Defendant next contends there is insufficient evidence that he acted with intent to kill as necessary to support his convictions for attempted murder and exploding a destructive device. Although we reverse the judgment as to these counts of conviction as

---

[7] While the Attorney General appears to recognize the applicability of the *Chapman* harmless error standard, he only asserts that the error was "clearly harmless," not that it was harmless beyond a reasonable doubt. Regardless, we find prejudice.

14

discussed *ante*, we address defendant's claim for purposes of determining whether retrial is permitted. (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [retrial after reversal permitted except when evidence was insufficient].) We agree there is insufficient evidence to support those counts of conviction with respect to Bigelow and Yvette, but we disagree as to Jessica.

A. *Standard of Review*

"In determining the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Leon* (2008) 161 Cal.App.4th 149, 156.) Judicial review of a claim of insufficient evidence includes review of "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

B. *Intent to Kill Jessica*

We described the elements of attempted murder *ante*. The crime of explosion of an explosive or destructive device with intent to murder requires the People to prove (1) defendant exploded, ignited, or attempted to explode or ignite any destructive device or explosive, and (2) when defendant did so, he acted with intent to murder someone. (§ 18745.)

There is substantial evidence defendant intended to kill Jessica at the time he threw the Molotov cocktail at the apartment building. Defendant knew Jessica, knew where she lived, had previously been in her apartment, and often stayed with Morias at the apartment complex. Yvette testified that Jessica and defendant had been in a "heated" argument the day of the fire, and Jessica testified she believed Morias-- defendant's girlfriend--was seeking revenge. While we recognize proof of motive is not

15

required to establish intent to kill, presence of a motive is often probative of intent to kill. (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.)

Defendant set fire to the building using a Molotov cocktail, an incendiary device that included an accelerant making the fire hotter and faster burning. (See *People v. Townsend* (2010) 182 Cal.App.4th 1151, 1155 [Molotov cocktail is a classic instrument of violence having no other purpose but as a weapon; as a bomb, a Molotov cocktail is more dangerous than other deadly weapons typically used in crimes].) He set fire to the building late at night, a time when Jessica would be home and asleep. Additionally, Jessica saw defendant at the scene of the fire, and he fled the scene rather than help put out the fire, suggesting an intent to kill. (See *People v. Martinez* (1952) 38 Cal.2d 556, 561 [failing to aid in rescue attempts and actively hindering those attempts were acts of deliberation; jury could reasonably conclude acts were done pursuant to premeditated plan to kill defendant's wife].)

Defendant asserts there is insufficient evidence that he intended to throw the Molotov cocktail into an uninhabited downstairs unit in order to allow the fire to grow and reduce the chance that the fire would be put out. He contends that argument is entirely speculative, and it is just as reasonably likely that he intended to throw the Molotov cocktail into Jessica's apartment to frighten her and his throw fell short. We agree a reasonable jury *could* find that defendant merely intended to scare Jessica. But even if defendant intended to throw the Molotov cocktail directly into Jessica's apartment, a reasonable jury *could* find that throwing an incendiary device directly into Jessica's apartment demonstrated an intent to kill her.

Defendant relies on *People v. Belton* (1980) 105 Cal.App.3d 376, a case in which the defendant set fire to his former wife's apartment building twice in the same night. (*Id.* at pp. 378-379.) The defendant had struck his former wife three months before the incident, without repeat, and the defendant and his former wife had spent the day of the fire together in "reasonable tranquility." (*Id.* at p. 380.) The appellate court reversed

16

defendant's conviction for attempted murder and two counts of arson, concluding nothing supported the finding that defendant intended to kill anyone; rather, it was equally likely defendant wanted to destroy the property to impoverish his former wife or to have the building rebuilt at the insurance company's expense. (*Ibid*.) The court recognized that proof of arson of an inhabited dwelling is not a sufficient basis from which to infer intent to kill, and in that case, there were no "threats of personal injury, vows of vengeance, conversations about contemplated personal violence, or earlier attempts at murder." (*Id*. at p. 381.)

With respect to Jessica, *Belton* is distinguishable. While the *Belton* court found no evidence of an intent to kill aside from the fact the defendant set the fire, here there is evidence defendant had been in a heated argument with Jessica earlier on the day of the fire, and Jessica believed Morias was seeking revenge. A reasonable jury could have found that defendant sought to take violent revenge against Jessica following the altercation. Accordingly, there is substantial evidence to support the finding that defendant intended to kill Jessica

C. *Intent to Kill Yvette and Bigelow*

We reach a different conclusion with respect to Yvette and Bigelow. As we concluded *ante*, the kill zone theory of attempted murder does not apply here. In closing, the prosecutor recognized defendant was charged with attempting to murder Bigelow and Yvette *solely* under this theory: "[T]he reason why [Bigelow] is also included and [Yvette] is included in this particular thing is in the jury instruction you were -- the phrase is a kill zone, that is a zone of harm."

With respect to Yvette and Bigelow, *People v. Belton*, *supra*, 105 Cal.App.3d 376 is on point. Merely setting fire to a building, without more, is not sufficient evidence of an intent to kill the occupants of a building. (*Id.* at p. 381.) There is substantial evidence defendant intended to kill Jessica, as we have discussed, but there is a conspicuous absence of any evidence suggesting defendant intended to kill either Yvette or Bigelow.

17

At most, the evidence suggests defendant consciously disregarded the risk of serious injury or death to the other occupants in the building in his effort to kill Jessica, which is not sufficient to show an intent to kill. (See *Canizales*, *supra*, 7 Cal.5th at p. 607.)

The Attorney General contends a reasonable jury "could easily infer" that defendant intended to kill everyone inside the apartment building, but that is simply an argument for the application of the kill zone theory, which we have concluded does not apply here. Because there is insufficient evidence of defendant's intent to kill Bigelow and Yvette, retrial of the attempted murder and exploding a destructive device with intent to murder counts as to Bigelow and Yvette is precluded.

## III

### *Prosecutorial Misconduct*

Defendant also argues the judgment must be reversed on the basis of prosecutorial misconduct because the prosecutor cross-examined the sole defense witness concerning a letter the witness purportedly wrote in support of a person convicted of child molestation, when in fact the letter was written by someone other than the witness, and the letter did not include the language the prosecutor purported to quote from it. We conclude the prosecutor lacked a good faith basis for the questions he posed to the witness, but defendant did not suffer prejudice as a result of the misconduct.

A. *Procedural Background*

T.J. Morrison testified for the defense that defendant and Morias were at his house at the time of the fire. On cross-examination, the prosecutor asserted Morrison had written a letter in support of another one of defense counsel's clients, Thomas Fred, in a "child molest case." Then the following exchange took place between the prosecutor and Morrison:

"Q. Did you write a letter on behalf of Thomas Fred at a sentencing saying there's no way he could have committed that particular crime and provided that letter to [defendant's trial counsel] at the sentencing for Thomas Fred?

18

"A.  No.

"Q.  So that letter that says I, TJ Morrison --

"A.  Do you have a copy.

"Q.  That I TJ Morrison know that Thomas Fred would have never had molested those kids?

"A.  I never written a letter like that.  Can I see a copy.

"Q.  Didn't you also write another letter in regard to Juan Medina claiming that if you were released from jail that you would say that Juan Medina was the one who killed the gentleman in Artois?

"A.  No."

Defense counsel objected on the basis that he had not been provided with "any of that information," and the objection was sustained.  The court then sustained a defense objection after the prosecutor accused Morrison of being "just a snitch for hire."  The prosecutor attempted to find the letter on his computer, but the court directed the prosecutor to move on.  The prosecution never produced the letters Morrison purportedly wrote in those other cases.

Defendant's new attorney filed a motion for new trial, claiming in part that the prosecutor committed prejudicial misconduct during his cross-examination of Morrison. The defense produced a letter written by John Joey Morrison--not T.J. Morrison--in support of Thomas Fred, and asserted T.J. Morrison did not write a letter in support of Fred.  Additionally, the letter neither mentioned T.J. Morrison nor included a sentence anything like to the prosecutor's quoted material.

The prosecutor asserted his questions were based on the mistaken belief that T.J. Morrison had written the letter that was written by John Joey Morrison.  He asserted his "improper questions" to Morrison "were based on mistaken identity" and "are not of the type to provide the basis of a new trial."  At the hearing on the motion, the prosecutor stated--incorrectly--that "[c]hild molestation wasn't mentioned."  The prosecutor again

19

stated the questions to Morrison regarding the letters was the result of a "mix-up" and constituted minor, harmless error.

The trial court denied defendant's motion for new trial without specifically mentioning the prosecutorial misconduct. The court recognized there "probably were errors that were made," but concluded any such errors were minor and did not support granting a new trial.

B. *Legal Background*

The standard of review for an order on a motion for new trial differs depending on whether the trial court granted or denied the motion for new trial. (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.) Where the trial court grants the motion for new trial, we apply the deferential abuse of discretion standard. (*Ibid.*) However, where defendant's appeal reasserts claims previously raised in an unsuccessful new trial motion, we employ independent review and judgment to determine if prejudicial error occurred. (*Id.* at p. 1261.)

" ' " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.) Misconduct under state law will not be overturned " ' "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." ' " (*People v. Young* (2019) 7 Cal.5th 905, 932-933.)

"A prosecutor may not ask questions of a witness suggesting facts harmful to a defendant without a good faith belief that such facts exist. [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 434.) "In other words, 'a prosecutor may not examine a

witness solely to imply or insinuate the truth of the facts about which questions are posed.' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1186.)

C. *Defense Counsel's Failure to Object*

The Attorney General contends defendant forfeited his claim of prosecutorial misconduct by failing to object at trial. Defendant acknowledges his counsel failed to object to the prosecutor's questioning on the basis of prosecutorial misconduct, but he asserts we should excuse his trial counsel's failure to timely object to the alleged misconduct because, at the time of the cross-examination, defense counsel had no basis for believing or demonstrating that misconduct had occurred. He contends his trial counsel assumed that the prosecutor was reading from a letter when he appeared to quote from the letter.

"A claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made 'a timely and specific objection at trial' and requested an admonition. [Citations.]" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.) Additionally, "[r]aising an error for the first time in a motion for a new trial is not sufficient to preserve the issue for appeal." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1178.) However, we may excuse a lack of an objection and request for admonition where objection would have been futile or request for admonition ineffectual. (*People v. Potts* (2019) 6 Cal.5th 1012, 1035.)

Here, defense counsel objected to the prosecutor's discussion of the letters on the basis that counsel had not been provided with the information, and that objection was sustained. We agree that without the opportunity to review the purported letters, counsel did not have a reasonable basis for accusing the prosecutor of questioning Morrison without a good faith basis for doing so. Rather, defense counsel made the only appropriate objection available to him at the time. Defendant did not become aware of the prosecutor's alleged misconduct until after the trial, when defendant's newly appointed counsel located the letter written by John Joey Morrison on behalf of Thomas

21

Fred.  Accordingly, we conclude defendant preserved his claim of prosecutorial misconduct.

      D. *Analysis*

      At the outset, we agree with defendant that the prosecutor lacked a good faith basis for questioning Morrison about letters he did not write.  Even the most cursory review of the letter written on behalf of Fred clearly demonstrates that the letter was not written by T.J. Morrison.  Moreover, as demonstrated by defendant in his motion for new trial, a routine search of superior court cases in Glenn County reveals that John Joey Morrison and T.J. Morrison are different people.  While we recognize John Joey Morrison and T.J. Morrison share a last name, that fact is not sufficient to assert a good faith basis where the first names differ, and the most basic of fact checking reveals that the witness and the author are different people.

      Further, the prosecutor certainly did not have a good faith basis for pretending to quote from the letter using language not remotely resembling any passage appearing in the letter at issue.  Purporting to quote the letter, including inserting T.J. Morrison's name as directly supporting a person accused of molesting multiple children, provided additional support for the proposition that T.J. Morrison wrote the letter, and his denial confirmed his dishonest character.  The prosecutor's decision to pretend to quote from the letter itself was patently inexcusable.

      We must next decide whether it is reasonably probable a result more favorable to the defendant would have been reached without the prosecutor's misconduct.  We conclude it is not.  First, Jessica knew defendant, had interacted with him that same day, and testified she was one "hundred percent" sure she saw defendant standing outside of her apartment at the time of the fire.  Jessica yelled defendant's name and he reacted by running away, and Jessica told the 911 operator that defendant was "throwing fire bombs at [her] apartment."

22

Second, while we recognize that one of the principal issues in this case was the identity of the person who threw the Molotov cocktail, Jessica's identification of defendant was not the only evidence connecting him to the crime. Jessica described the clothing defendant wore at the time of the fire, which matched the clothing he wore at the time of his arrest. Additionally, Detective Knight found cloth in the apartment where defendant had been staying that matched cloth found in the Molotov cocktail.

Third, Morrison's credibility was impeached in other ways. Morrison acknowledged he had previous criminal convictions, including for drugs and theft. He also agreed he did not come forward as an alibi witness or alert law enforcement when he learned defendant was being charged with the crimes at issue here, instead writing a letter and giving it to Morias. Moreover, Morrison's responses to the prosecutor's questions likely mitigated the effect. Morrison vehemently denied writing the letters and requested to see the letters, calling the prosecutor's bluff. Indeed, the prosecutor was unable to produce the letters and was told to move on by the court, further mitigating the questions' effect on the jury.

Finally, the jury was properly instructed that nothing attorneys say, including their questions, is evidence. Neither the prosecutor nor defense counsel discussed the letters during their closing arguments. We presume the jury followed the court's instructions (*People v. Sanchez* (2001) 26 Cal.4th 834, 852), and therefore we presume the jury did not consider the prosecutor's unsupported accusations against Morrison as evidence of their truth.

Because it is not reasonably likely defendant would have obtained a more favorable result had the prosecutor not committed misconduct, we conclude defendant's claim of prosecutorial misconduct does not compel reversal.

23

IV

*Ineffective Assistance of Counsel*

Defendant filed a motion for a new trial on the basis that his trial counsel had rendered constitutionally ineffective assistance by failing to subpoena Morias to secure her availability to testify at trial as an alibi witness. Defendant's trial counsel stated in a declaration that his investigator interviewed Morias, and Morias "was a friendly witness who had voluntarily stayed in contact with me and attended hearings. For this reason I did not have her served with a subpoena." Defendant's trial counsel did not call Morias at trial because he could not find her when he was putting on the defense case.

The trial court denied defendant's motion for new trial, and defendant re-asserts his claim of ineffective assistance here. We conclude it lacks merit.

A. *Legal Background*

To establish ineffective assistance of counsel, defendant must show: (1) counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance. In determining prejudice, the inquiry is whether there is a reasonable probability that, but for counsel's deficiencies, defendant would have obtained a more favorable outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692-694; *People v. Frye* (1998) 18 Cal.4th 894, 979, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland,* at p. 694; *In re Harris* (1993) 5 Cal.4th 813, 833.) "[T]he question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " (*In re Harris*, at p. 833.) To show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland*, at p. 693.)

24

We presume "that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " '[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had " ' "no rational tactical purpose" ' " for an action or omission.' [Citation.]" (*People v. Woodruff* (2018) 5 Cal.5th 697, 746.)

B. *Analysis*

Defendant contends his trial counsel's explanation for not subpoenaing Morias-- that she was a friendly witness, was cooperative with the defense investigator, and indicated she would appear to testify--was not sufficient reason for him to disregard his duty to secure her testimony. We disagree. Subpoenaing a cooperative witness runs the risk of offending and thereby alienating the witness. Counsel may reasonably have determined he was more likely to secure Morias's testimony by keeping her as a friendly witness rather than attempting to force her to testify and risk her not appearing at all. Because we disagree with defendant that his trial counsel lacked a conceivable tactical purpose for not subpoenaing Morias, we conclude he has failed to show his counsel's performance was deficient.[8]

---

[8] Because we conclude defendant's trial counsel was not constitutionally ineffective, and we reverse defendant's convictions on counts I through VI as discussed *ante*, we do not address defendant's assertion that the judgment must be reversed due to cumulative error. Additionally, we need not and do not address the sentencing claims.

## DISPOSITION

The judgment as to counts I through VI is reversed and the case is remanded for possible retrial of counts II and V and resentencing.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Mauro, Acting P. J.

_____/s/_____
Krause, J.